

ENTERED
03/10/2014

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| AOP INTERNATIONAL CORP. | § | |
| | § | |
| DEBTOR(S) | § | CASE NO.  12-34566-H5-7 |
| | § | |
| AOP INTERNATIONAL CORP. | § | |
| EVA S. ENGELHART, TRUSTEE | § | |
| PLAINTIFF(S) | § | ADVERSARY NO. 12-3432 |
| | § | |
| VS. | § | |
| RICHARD NEGRIN | § | |
| | § | |
| | § | |
| DEFENDANT(S) | § | |

## MEMORANDUM OPINION

Before the Court is the amended complaint of Eva S. Engelhart, chapter 7 trustee for the estate of AOP International Corp., d/b/a AOP Corporation, against Ricardo Negrin to avoid preferential transfers pursuant to 11 U.S.C. §547. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (O). AOP filed a chapter 11 bankruptcy on June 15, 2012.  The case was converted to  chapter 7 on October 17, 2012, and Eva S. Engelhart was appointed chapter 7 trustee for the estate of AOP International Corp., d/b/a AOP Corporation.

The trustee seeks to avoid two allegedly preferential transfers made to Ricardo Negrin: (1) the Venezuelan Navy transfer on November 16, 2011; and (2) the Colombian Air Force Transfer on August 23, 2011. Negrin was an employee and minority shareholder of AOP. From time -to-time Negrin was an officer of debtor. Under 11 U.S.C. 547(b), the trustee must prove that Negrin was an "insider" on each transfer date as defined by 11 U.S.C. § 101(31)(B).

Following a trial and in consideration of the testimony and admitted evidence, the Court finds that Negrin was an officer and an insider of the debtor on August 23, 2011 at the time of the Colombian Air Force Transfer, but Negrin was not an officer on November 16, 2011 the time of the Venezuelan Navy transfer.

In addition, Negrin raises a "new value" defense under § 547(c) by personally making new loans and paying AOP vendors. The Court finds Negrin's testimony is credible and establishes his defense of new value. Consequently, the trustee has failed to prove the transfers were preferential under § 547(c).

## I. Findings of Fact

### A. AOP's Management

Debtor sells aircraft parts and performs aircraft maintenance for third parties. Glemon Antonio Silva was AOP's president, 70% shareholder, and sole director. Silva testified that he formed AOP on October 1, 1993. Originally, Silva was AOP's

only employee, but by 1998, AOP had sales of $500 - 600,000 a year and 4 employees. The company continued to grow and ultimately employed 17 people.

Negrin began working in aviation services after graduating from college. Negrin and Silva met in 1999. AOP provided parts for the company for which Negrin worked. At the time, Negrin worked with the Venezuelan Army and had business opportunities with which he needed help. Initially, AOP compensated Negrin on a commission basis. Negrin became a full time employee of AOP in 2006 or 2007. In 2007, Negrin became the executive vice president of marketing and a full time employee of AOP making a salary of approximately $120,000 a year. Silva gave Negrin a 30 percent ownership interest in AOP in lieu of paying accrued commissions of 1-2% owed to Negrin on $40 million in contracts he brought to the company.

In 2010 AOP's management consisted of Juan Carlos Reticent as COO, Tony Chavira, as comptroller, Liseth Negrin as VP of Administration, Ricardo Negrin as VP of Marketing, and Silva as president. Reticent left the company in October 2010. Chavira left the company in May 2011, until then, Chavira controlled AOP's books and records.

Liseth Negrin is Ricardo Negrin's sister. Liseth Negrin joined AOP in 2002. Silva hired Liseth Negrin to help with human resources and administration at AOP. Silva described Liseth Negrin's duties as VP of Administration, "Everything that had

to with accounting, finances, was handled through Liseth Negrin and either with my approval or the agreement between Ricardo and me on what or which direction we were willing to go." Silva testified that Liseth Negrin maintained AOP's QuickBooks files on a day-to-day basis that it was common for Liseth Negrin to sign contracts for AOP.  Liseth Negrin left the company in November 2011.

Negrin testified that Liseth Negrin, as the vice president of business administration, had access to AOP's financial information. Negrin testified that he did not have access to AOP's financial information. Negrin testified that he did not have access to any of AOP's bank accounts other than the Brazos Valley Bank account. Negrin was authorized to sign at the Brazos Valley Bank account, but denies that he had sole authority over the account.

Another individual, Gustavo Nunez, worked on behalf of AOP in Venezuela under a power of attorney executed by Silva. Nunez handled AOP's contracts with the Venezuelan Navy. AOP also had contracts with the Venezuelan Army, handled by Negrin, and with Paradesa, the National Petroleum Company, handled by Silva. According to Silva, Silva contends Gustavo Nunez was not an employee or an independent contractor of AOP, he  merely assisted Ricardo Negrin in Venezuela.

## B. Colombian Air Force Contract

On March 8, 2011, in response to a Request to Present Bids, AOP submitted

a Goods Purchase Agreement to the Colombian Air Force Purchasing Agency to supply five aeronautical parts by April 7, 2011 for payment in the amount of $126,444.18. Paragraph 8 of AOP's submission states, "Payments will be made by check in U.S. dollars (USD) from a U.S. financial institution issued to the name of the Supplier, or by direct deposit to: . . . " AOP's proposal specifies that direct deposit should be made to AOP account number 3328295 at Amegy Bank. Paragraph 19 of AOP's proposal states, "The present Agreement has complete legal effect when it is signed by each party and transmitted to the other party by Fax or email." The copy of the proposal in evidence is signed only by AOP and not by the Colombian Air Force Purchasing Agency.

Silva testified that Liseth Negrin signed AOP's contract with the Colombian Air Force. Subsequently, AOP and the Colombian Air Force Purchasing Agency agreed to reduce the number of parts to be supplied to one item and to reduce the price to be paid to $48,184.50.

Both Silva and Negrin testified that AOP borrowed money from Negrin in order to acquire the part specified in the contract. Negrin testified that AOP did not have the funds to complete the contract; consequently, he loaned AOP the funds to purchase parts and materials to complete the contract for the Colombian Air Force Purchasing Agency. Negrin testified that during 2010 and 2011, he loaned AOP

approximately $77,000, to fulfill contracts, including the contract with the Colombian Air Force Purchasing Agency and to purchase parts from Hamilton Sunstead for a contract with Citgo.

## C. Venezuelan Navy Contract

Silva testified that in early 2009, AOP obtained a contract with the Venezuelan Navy to refurbish a Beechcraft King Air 200. AOP was to refurbish the interior, the avionics, and the exterior and install new technology to bring the aircraft up to date. Upon completion, AOP would deliver the aircraft to the Venezuelan Navy. The contract was for approximately $3 million to be paid in three installments. Silva contends Ricardo Negrin negotiated the contract with the Venezuelan Navy. However, Negrin testified Gustavo Nunez handled all contracts with the Venezuelan Navy.

Silva testified that he personally handled all the technical and logistical aspects of the Venezuelan Navy contract including determining all costs and what would be required to perform the contract. Silva testified that after the contract was signed, he oversaw AOP's subcontractors to make sure they performed the work the way it was designed within the required time frame to make sure all deadlines were met.

At trial, Silva described the work required to refurbish the aircraft in detail. Silva testified that AOP subcontracted repairs of the aircraft to several vendors. Silva

explained that the aircraft was brought to Hobby Airport for work to be performed by Hawker Beechcraft Services. Then, Silva explained, the aircraft's two Pratt and Whitney 56-42 engines were pulled off the aircraft by Hawker Beechcraft and shipped to Wind Turbines, a company in Oklahoma, for overhauling. Silva testified that other vendors overhauled other components of the aircraft. When the work was completed, the components were returned to Hawker Beechcraft where they were reinstalled onto the aircraft. AOP completed the repairs in late January 2010, but had to wait for payment from Venezuela on the second installment prior to flying the aircraft to Venezuela for delivery to the Venezuelan Navy.

Silva testified that AOP flew the aircraft to Venezuela on April 16, 2010, but as the plane came off the runway onto the taxiway, the left-hand landing gear collapsed, damaging the wing, the landing gear, the propeller, the turbine engine, the left-hand side of the aircraft, and the flight controls. Although AOP's insurance ultimately reimbursed 99.9 percent of the cost of the repairs, the accident delayed the final payment to AOP due under the contract in the amount of $926,372.00. Silva testified that AOP started experiencing financial difficulties when it was not able to collect $985,000 in April 2010.

Silva testified that AOP had to repair the damaged aircraft in Venezuela, but brought the wing and turbine engine back to the United States for repairs then

P:\NEGRIN OPIN 030714.wpd                7

shipped them back to Venezuela for reinstallation onto the aircraft. AOP finished the repairs necessitated by the accident in late June 2011. After the repairs were completed, AOP made arrangements to redeliver the aircraft to the Venezuelan Navy.

For the period that the aircraft was being repaired in Venezuela, Ricardo Negrin stayed in Venezuela to complete the repairs. Silva testified that Ricardo Negrin handled the protocol for delivery of the aircraft to the Venezuelan Navy because Negrin was in Venezuela. Silva testified that all communications between AOP and the Venezuelan Navy went through Ricardo Negrin. Silva testified that he knew also that Gustavo Nunez was part of that communication process between AOP and the Venezuelan Navy. According to Silva, Ricardo Negrin instructed Nunez as to whom to talk to. Silva testified that he, Silva, was not involved in that process. Silva testified, "Listen, I'll try to explain this again. When you're dealing with the Venezuelan government, there are many different things that you have to do to make things happen. Ricardo would say, Glemon, we need Gustavo Nunez listed with an authorization so he can go into the meetings and deliver documents. Ricardo never would let Gustavo Nunez negotiate anything because Gustavo Nunez did not have that kind of capacity to do that. However, we did grant a document to Gustavo Nunez so he could go in there any time that Ricardo wasn't physically in Venezuela to act on behalf of AOP. So he could actually either deliver documents, receive documents

or exchange information with a customer. That's what that document did." Silva

testified that he had no power or decision-making over Gustavo Nunez even though

he had executed a power of attorney in favor of AOP to act on AOP's behalf. Silva

testified that everything was done through Ricardo Negrin. Silva testified that Nunez

never executed any contracts on behalf of AOP that were not under Ricardo Negrin's

instruction. Silva testified that the power of attorney he  executed was nothing more

than a requirement in order to be able to fulfill the presence of AOP on behalf of

Ricardo Negrin in Venezuela when Ricardo was not physically there.

**D. AOP Bank Loans**

AOP had working capital loans with Brazos Valley Bank and with Community

National Bank. Silva testified that in 2007 or 2008, AOP obtained a line of credit

from Brazos Valley Bank secured by AOP's assets that he personally guaranteed.

Subsequently, when BVB required additional security for the loan,  AOP could not

provide it. Although AOP could not repay its loan with BVB, but AOP had been

approved for a $600,000 line of credit by CNB. CNB, however, would not grant the

loan unless BVB released its UCC on AOP's assets. Silva testified that Ricardo

Negrin offered to meet with BVB to renegotiate the loan and did so. Silva testified

that Negrin obtained a release of BVB's UCC on AOP's assets:

> [T]he existing [Brazos Valley Bank] note for 400 and some thousand
> was a continuation of a loan that could not be paid off by AOP. And we

had been approved by Community National Bank for a new line of credit for $600,000, but we couldn't access that until we had complete release from Brazos Valley on their note. That's when Ricardo proposed to negotiate that with Brazos Valley, and he did. He went over there and negotiated that note, and we got a release from Brazos Valley; that is on the UCC. That basically triggered the new loan or the working capital loan with Community National Bank.

The exhibits show that Silva executed a note for a revolving line of credit from Community National Bank for $600,000 on April 13, 2010, secured by AOP's assets and personally guaranteed by Silva. Silva testified that after the aircraft crashed on April 16, 2010, he visited again with Community National Bank, informed them that AOP would not be receiving the $985,000 Venezuelan receivable expected in April and therefore needed an increase in working capital capacity. Silva testified that at the time he executed the note for the line of credit at Community National Bank, there were no restrictions on the use of the Venezuelan receivable when it was received. On July 20, 2010, Silva executed a Revolving Credit Note to Community National Bank for $1,400,000.00 secured by AOP's inventory and accounts and Silva's personal guaranty.

Silva's testimony concerning Negrin's renegotiation of the BVB loan suggests that Negrin renegotiated BVB's loan in April 2010 in order to obtain the $600,000 CNB loan However, Negrin testified that he did not become aware of the CNB line of credit until April or May 2011. Further, the exhibits show that BVB's loan was not

renegotiated until December 2010.

On December 28, 2010, Silva, as president of AOP, executed a Commercial Loan Agreement and a Promissory Note for loan number 400584900 in favor of Brazos Valley Bank in the amount of $469,857.50 dated December 9, 2010. Loan number 400584900 states that its purpose "is to pay off Brazos Valley Bank loan number 400584900; originally made to finance the purchase of inventory and services for the continuing operations of AOP Supply Corp." See Paragraph 4G of the Commercial loan Agreement and paragraph 8 of the Promissory Note. Loan number 400584900 dated December 9, 2010, matured on December 9, 2011.

The Trustee testified that the December 2010 AOP loan was secured by Ricardo Negrin's personal certificates of deposit in the amount of $600,000.00. The Promissory Note for that loan states at paragraph 9, that the loan is secured by a separately prepared document named Assignment of Deposit/Share Account on account number 10690 by Ricardo David Negrin. Negrin executed an Assignment of Deposit/Share Account dated December 9, 2010, in favor of Brazos Valley Bank to secure loan number 400584900, but the document is redacted as to the deposit account number and does not purport to pledge to Brazos Valley Bank any certificates of deposit.[1] Negrin executed a guaranty of AOP's Brazos Valley Bank loan number

---

[1]In addition to guaranteeing the AOP BVB loan in December 2010, Negrin executed a Commercial Loan Agreement in favor of Brazos Valley Bank for loan no. 400307400, dated

400584900. Silva also guaranteed the loan, although in his testimony he initially denied that he had guaranteed the debt.

Negrin's guaranty states at paragraph 5:

5. BANKRUPTCY. If a bankruptcy petition should at anytime be filed by or against the Borrower, the maturity of the Debt, so far as my liability is concerned, shall be accelerated and the Debt shall be immediately payable by me. I acknowledge and agree that this Guaranty, and the Debt secured hereby, will remain in full force and effect at all times, notwithstanding any action or undertakings by, or against, you or against any Property, in connection with any obligation in any proceeding in the United States Bankruptcy Courts. Such action or undertaking includes, without limitation, valuation of Property, election of remedies or imposition of secured or unsecured claim status upon claims by you, pursuant to the United States Bankruptcy Code, as amended. In the event that any payment of principal or interest received and paid by any other guarantor, borrower, surety, endorser or co-maker is deemed, by final order of a court of competent jurisdiction, to have been a voidable preference under the bankruptcy or insolvency laws of the United States or otherwise, then my obligation will remain as an obligation to you and will not be considered as having been extinguished.

Negrin testified that at the time he executed his personal guaranty of the Brazos

_____

December 9, 2010, for a personal loan in the amount of $200,000.00, with a maturity date of December 9, 2011. In connection with his personal loan with BVB, Negrin executed an Assignment of Certificate of Deposit/Share Certificate (Uncertified) dated December 9, 2010, pledging the following property to Brazos Valley Bank to secure the loan:

3. PROPERTY DESCRIPTION. The Property is described as follows:
A. Certificate of Deposit/Share Certificate (Uncertificated): Account Number 10690, with a face amount of $703,414.68 issued on NOVEMBER 15, 2006 and issued by Brazos Valley Bank, NA located at 4030 Highway 6 South, College Station, Texas 77845.

Valley Bank loan, he and Silva had agreed that once the aircraft was delivered and

the Venezuelan Navy paid, the payment would go directly to Brazos Valley Bank so

that Negrin's guarantee would be released. Silva testified that he and Negrin had no

such agreement.  Silva also testified that AOP was not obligated to use the proceeds

of the Venezuelan Navy receivable to repay any particular debt:

> A . . . Now, was there an agreement between Ricardo Negrin and myself
> that only if the payment on the aircraft is done, he would do that? No.
> That was never part of any communication or conversation between the
> two of us. When April 16 of 2010 comes around and we had the issue
> with the aircraft, yes, the idea was that once we collected on the 985, we
> would pay any loans that we had, even money back to Ricardo.
> However, that changed the moment that the aircraft had the incident
> because there is no 985, and that collateral became property of
> Community National Bank. There was nothing that I could change for
> that matter.
>
> Q So prior to April of 2010 there was discussion that that 985 would be
> used to pay off the Brazos Valley Bank and release Mr. Negrin's C.D.?
>
> A Well, Community National Bank never said, listen, the money that
> you get paid on the 985, you've got to pay a hundred percent of that. It
> was a revolving line of credit. We could have paid a hundred thousand
> out of the 985 or $985,000 back to Community National Bank, but that
> was not a requirement. However, this is April 16th of 2010, we're
> collecting on the 985 in the next 30 to 60 days. That changed that day.
> There was nothing that I could do about that.
>
> Q And it changed that day when the airplane had the incident?
>
> A Right, right, right. Because at that moment, that collateral became
> unusable. There's no 985. There's no 985 until we repair the aircraft and
> then eventually deliver the aircraft, and it took another year to be able
> to do that.

Q But you did say that prior to that time, there was an agreement that that 985 be used to pay Brazos Valley Bank off and release Mr. Negrin's C.D.

A No. No, there was not such an agreement. We talked about how or what we were going to do with the money once it gets paid. And obviously, you know, we would have to pay whatever we owed at the time. But there was no specific agreement to say only if I do this, we'll collect on the 985 and then I get that money back to pay Brazos Valley or whoever else. There was not such a thing. We talked about making payments. It was payroll, it was vendors, it was the bank lines of credit. We could have gone back and paid a portion to Brazos Valley and renegotiated the balance. I mean there were many options that we had at the time. But the moment that we actually had the incident with the aircraft, it changed the landscape right there and then.

**E. Silva and Negrin's Agreement**

Silva testified that the Venezuelan airplane crash strained AOP's finances. Vidal Martinez was AOP's attorney. Silva and Negrin met several times with Martinez at his office. After their last meeting, Martinez sent an email to Silva in which Martinez advised that for the benefit of the company Negrin and Silva should sign an agreement to bring the pressure down between Ricardo Negrin and Silva to try to get the company to move forward.

On June 9, 2011, Silva and Negrin executed a written agreement drafted by Martinez that states, among other things, 'The inbound Venezuela receivable of approximately $1MM should be used to pay Brazos Valley and Leo Prado and Ricardo Negrin. Ricardo Negrin will control the flow of money through AOP's

P:\NEGRIN OPIN 030714.wpd          14

account with Brazos Valley Bank until distributed.' On June 9, 2011, Negrin sent an email to Martinez requesting a corporate resolution putting Negrin in sole control over any and all funds deposited to AOP's Brazos Valley Bank and providing that the payment from Venezuela would be wired directly to AOP's Brazos Valley Bank account to satisfy Leo Prado's and Brazos Valley Bank's debt. On June 10, 2011, Negrin signed an account agreement for an account at Brazos Valley Bank for AOP Supply Corporation. On June 21, 2011 Silva, as president and Liseth Negrin as V.P. of Administration of AOP sent a letter to Brazos Valley Bank that states, "The present is to confirm our decision to designate Ricardo Negrin as the only signer in AOP's checking account No. 3003363."

Because Community National Bank had a security interest in AOP's receivables, Silva, Negrin, and AOP's attorney discussed notifying Community National Bank that the Venezuelan receivable would be paid to Brazos Valley Bank. Silva testified that the Community National Bank loan documents did not require AOP to use the Venezuelan receivable to pay down the revolving line of credit. Silva further testified that Community National Bank  never told AOP to use the Venezuelan receivable to pay AOP's revolving credit line with Community National Bank. Ultimately, no one notified Community National Bank of AOP's intention to use the Venezuelan receivable to pay the Brazos Valley Bank loan.

**F. Colombian Air Force Transfer**

AOP's August 2011 Brazos Valley Bank account statement states, "8/23 Colombian Air 48184.50" under the heading, "Deposits/Credits/Interest-Paid." The account statement also states, "8/23 Internet transfer to checking" under the heading, "Checks Paid/Debits/Charges." The account statement does not identify to whom the funds were transferred.

Silva testified that Liseth Negrin instructed the Colombian Air Force to wire transfer the funds into AOP's Brazos Valley Bank account. Silva further testified that Liseth Negrin pulled the money out of the account. Silva testified that Liseth Negrin "was the only one that had access to that bank account." Silva testified that he believes that the funds went to Ricardo Negrin's account at Brazos Valley Bank.

Negrin testified that he became aware in August 2011 that the Colombian Air Force had made payment to AOP in the amount of $48,184.50. Silva testified that he learned in early October 2011, that the Colombian Air Force had made the payment. Silva testified that AOP's August bank statement is the last one received from Brazos Valley Bank. Silva testified:

> Q And did the Colombian Air Force pay AOP for the material it provided?
> A Yes, it did pay for the material provided.
> Q And if you look at Exhibit 1 in the Trustee's exhibit notebook, this is the account statement from August from the Brazos Valley Bank account, is that correct?

A Correct.

Q Can you tell me what this shows here?

A It shows an incoming wire transfer for $48,148.50.

Q From who?

A From the Colombian Air Force.

Q And then there's a corresponding, the same day, a debit the next day. Do you know what that debit is for?

A Yeah, that's a debit for $48,000 that went out of the account.

Q Who did it go to?

A I believe it went to Ricardo Negrin's bank account at Brazos Valley.

Q And who directed that payment?

A Liseth Negrin, the V.P. of Administration, instructed the Colombian Air Force to wire transfer the funds into this account. How the money was pulled out of the account, Ms. Negrin was the only one that had access to that bank account.

**G. Venezuelan Navy Transfer**

On September 16, 2011, Eduardo Prado emailed Lindsay Dawson informing Brazos Valley Bank that a wire transfer would be sent in a few weeks that would be for a greater amount than was owed by AOP to BVB and the sender had only AOP's loan account number and not AOP's account number. Lindsay Dawson responded that it will be easiest for the bank to post it to the account and then payoff the loan from the account. Eduardo Prado replied that the loan must be paid off quickly and Ricardo Negrin's CDs released so that Ricardo Negrin can repay Leo Prado"the rest of the money."

Silva testified:

Q If you look at -- if you'd go back to Exhibit 2 again, we talked about the deposit from the Venezuelan Navy on November 16th. Can you tell

me what the debits are on November 16th and November 17th on this account statement?

A Well, the statement shows a debit on the 16th for $486,551.54, and then a wire transfer out on the 17th for $440,000.

Q And the $486,000, it says 'pay off loan'. Do you know what this loan that's being paid off here is?

A I don't know what that account number indicates.

Q Is it your understanding that this was paying off the Brazos Valley Bank loan?

A Yes, that's what I understand out of the documents that came from the subpoena.

Silva testified that he found out in October of 2011, that Negrin had instructed the bank to stop sending any bank statements to AOP," so neither the CPAs, myself, I would assume Liseth Negrin did not have access to the bank statements from Brazos Valley. And I didn't know for a fact the money had been paid until sometime in April of 2012."

AOP's statement for November for an account at BVB states, "Wire Transfer in $926,372.00." The statement further shows a debit in the amount of $486,551.54 to pay off loan no. 400584900. The statement further shows on November 17, 2011, "Wire Transfer out Wire Transfer Ben: Prado $440,000.00." Silva testified that he believes that Trustee's Ex. 2 is the bank statement from Brazos Valley on AOP Supply's bank account showing an incoming wire on November 16th of $926,000,

P:\NEGRIN OPIN 030714.wpd          18

that Silva believes is when the payment from the Venezuelan Navy came into AOP's

bank account. Silva testified:

> Q And the Venezuelan Navy made a payment of $926,372 on November the 16th, correct?
>
> A Correct.
>
> Q And that deposit was made into the account of AOP at Brazos Valley Bank.
>
> A To the loan account at -- AOP's loan account at Valley -- Valley -- at Brazos Valley Bank.

. . . .

> Q Same notebook; turn to tab two, Trustee's Exhibit 2. Is this the account statement for November, 2011, for AOP's Brazos Valley account?
>
> A Yes. That's correct.
>
> Q And if you look under the line "deposits, credits, interest paid," does this show a incoming wire transfer being deposited into this account on November 16th?
>
> A That's correct.
>
> Q And this is the deposit from the Venezuelan Navy.
>
> A Yes. That's correct.
>
> Q And, then, if we look a couple lines further down under "checks paid, debits, and charges," on November 16th there was a loan payoff of $486,551.54.
>
> A Yes. That's correct.
>
> Q This was a payoff of AOP's loan with Brazos Valley Bank, correct?

A Correct.

## H. Silva Removed Negrin

Silva testified that he and Negrin argued in November 2011. Silva testified that he removed Negrin as an officer of the company while Negrin was in Venezuela. Negrin immediately returned to Houston to meet with Silva. Prior to Negrin's arrival, Silva gave instructions and issued a resolution to remove Negrin as an officer. On November 4, 2011, Silva, as sole director of AOP, signed a  unanimous written consent of directors of AOP, removing Ricardo Negrin and Lisbeth Negrin as officers of AOP.

Silva testified that in the week preceding November 16, 2011, Negrin told Silva that the Venezuelan Navy was getting ready to file a lawsuit against AOP, that he/Negrin was making every single effort to stop that from happening, and that he was trying to negotiate for AOP  in order  that AOP would not be involved in litigation for delivery of the aircraft.  Prior to the conversation with Negrin, Silva testified that he found out that the aircraft had been moved  to the main facility of the Venezuelan Navy.

Silva testified that when he questioned Negrin about that,  Negrin said, "'No, Glemon, this is not what you think.'"Silva testified, "I had to believe that he had either delivered the aircraft or negotiated the delivery of the aircraft. He told me that

it was actually the opposite to that, that he was trying to use that to negotiate the situation with the Venezuelan Navy so we wouldn't get a lawsuit against us, and basically convinced me that I needed to trust him to move forward."

Silva testified that when Negrin returned to Houston to convince Silva "that what I thought was going on wasn't correct, it was not true. So I agreed to his explanation, rescinded the resolution, and that happened right around November 9, 2011." Silva maintained he rescinded the resolution on November 9, 2011. Although Silva agreed he never drafted another resolution to revoke his removal of Negrin as an officer of AOP. However,   Silva testified he did not have another resolution drafted because the original resolution was never "activated" and he had only sent the document out only once to Brazos Valley Bank. Silva testified that he followed up with the bank by email.

Trustee's Ex. 33 is an email from BVB bank officer Maria Flores to Silva that refers to Silva's "resolution dated on November 4, 2011 which was provided by you on November 9, 2011, and again on January 12, 2012." Negrin testified that a bank officer informed him that he had been removed as officer of AOP. Negrin emailed Marie Flores at BVB on November 9, 2011, in response to her communication to Negrin over a change in control of AOP's account at Brazos Valley Bank. In his email, Negrin thanks Flores for telling him about the proposed change concerning the

bank account and Negrin informs her that he and Silva had an agreement drafted by AOP's attorney stating that Negrin would control AOP's account at BVB and that Negrin did not think that the agreement had changed. Negrin states that he will discuss the matter with Silva to resolve the misunderstanding.

Silva testified that he and Negrin spoke on and off in November and December of 2011, then stopped speaking mid-December 2011. Silva contends he removed Negrin as an officer again on January 12, 2012.

Silva testified that he stopped asking Negrin whether or not the Venezuelan Navy was going to pay in late November 2011 or very early December of 2011. Silva testified that after November 16, 2011, Negrin told him that the Navy was not going to pay, that they were getting things ready for a lawsuit, and that the situation was very complicated.

Silva testified that other than the Venezuelan Navy payment and the Colombian Air Force payment that he was not aware of any other transactions in the BVB account because, "[t]hat account was in place due to the fact that it was a loan with Brazos Valley Bank account, and that was a requirement." Silva stated he believed Ricardo Negrin directed the payment to be made to BVB with respect to the Venezuelan Navy. Silva denies he directed the payment to be made to payoff of the BVB loan. Silva testified he did not have any access to that bank account.

## II. Avoidance of the Transfers

The trustee seeks to avoid transfers of AOP's property to Ricardo Negrin made on August 23, 2011 and on November 16, 2011, as preferential transfers of AOP's property made to an insider of AOP within one year of the bankruptcy filing. The Trustee testified that twenty-five claims have been filed against the estate and the trustee testified that as of the time of trial, unsecured claims total about $2.4 million, reduced from about $4 million. Integrity Bank lifted the stay to foreclose on the hangar eliminating Integrity Bank's claim for $1.2 to $1.3 million and the ad valorem taxes of over $200,000. The trustee expects to make a 1-2% distribution to unsecured creditors. The trustee testified that even with recovery on the claims held by the estate that there will not be a 100% distribution.

The trustee hired W. Marc Schwartz to give an expert opinion on AOP's solvency on August 23, 2011 and on November 16, 2011. Schwartz described his review of all documents bearing on AOP's financial health and his discussions with persons with knowledge of AOP's assets and liabilities covering the relevant time periods. Schwartz testified that in his opinion AOP was insolvent on both August 23, 2011 and November 16, 2011. Schwartz testified that on August 23, 2011, AOP's liabilities exceeded its assets by $746,000, and that on November 16, 2011, AOP's liabilities exceeded its assets by $1,018,000.00.

The  Court finds Schwartz's testimony is credible. Schwartz thoroughly explained AOP's assets and liabilities in 2011. Negrin did not present any contradicting evidence concerning AOP's solvency in 2011. Under Bankruptcy Code section 101(32)(A), the term "insolvent" means, for a corporation, "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." See 11 U.S.C. § 101. The Court finds that AOP's liabilities exceeded its assets on August 23, 2011 and on November 16, 2011 Therefore, AOP was insolvent on both  dates.

Bankruptcy Code §547(b) provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. §547(b).

Under Bankruptcy Code section 101(31)(B) if the debtor is a corporation, the term "insider" includes, "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor." See 11 U.S.C. §101(31)(B).

The Trustee must prove that Negrin was an insider of AOP on each of the transfer dates, August 23, 2011 and November 16, 2011. The Trustee testified that Negrin was an insider of AOP because he was an officer of AOP.

It is undisputed that Negrin was an officer of AOP on August 23, 2011. However, the Court finds that Silva, as the sole director of AOP, removed Negrin as an officer of AOP by Unanimous Written Consent on November 4, 2011. The Court finds that Silva's testimony that he reinstated Negrin as an officer of AOP on November 9, 2011, is not credible. November 9, 2011, is the date BVB bank officer, Maria Flores, identified that Silva informed BVB that he had removed Negrin as an officer of AOP. The Court concludes that there is no credible evidence that Negrin

P:\NEGRIN OPIN 030714.wpd          25

was ever reinstated as an officer of AOP after November 4, 2011.

The Trustee does not assert that Negrin was an insider of AOP because he was the minority shareholder. The Court finds that the evidence shows that Negrin's share ownership gave him no control over the finances or operations of AOP.

All evidence admitted shows that Silva controlled AOP's operations and finances. Access to AOP's financial information appears to have been restricted to Silva, Lisbeth Negrin, and Tony Chevaria. The Court finds that the Trustee failed to prove that Ricardo Negrin was an insider of AOP on November 16, 2011.[2] The Court finds that the Trustee has failed to prove that the transfer of AOP's funds to Negrin on November 16, 2011 is an avoidable preferential transfer to an insider of AOP.

As to the August 23, 2011 transfer, the transfer of AOP's property on August 23, 2011, was made within one year of the date of AOP's bankruptcy filing, was made to repay Negrin for an antecedent debt, and was made when AOP was insolvent. The transfer enabled Negrin to receive more than he would have received if the case were a chapter 7 , the transfer had not been made ,and Negrin had received payment under the Bankruptcy Code.

---

[2]Inasmuch as the Court finds that Negrin was not an insider of the debtor on November 16, 2011, the issue of whether Negrin's waiver of insider status under the guaranty he executed in connection with AOP's BVB loan is moot.

## III. New Value

### A. Negrin's Contention

Negrin contends that he gave new value subsequent to receiving the transfers

at issue. Bankruptcy Code section 547(c) provides:

(c) The trustee may not avoid under this section a transfer--

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor . . .

11 U.S.C. §547(c).

Under 11 U.S.C. §547 "new value" means money or money's worth in goods,

services, or new credit, or release by a transferee of property previously transferred

to such transferee in a transaction that is neither void nor voidable by the debtor or

the trustee under any applicable law, including proceeds of such property, but does

not include an obligation substituted for an existing obligation. See 11 U.S.C.

§547(a)(2).

### B. Unpaid Salary

Silva testified that he agreed with Ricardo Negrin at the beginning of 2011 or

late 2010 to defer salaries for six months. Negrin testified that although their agreement was to defer their salaries for one month, he was not paid any salary for all of 2011. Silva testified that as of June 12, 2011, Negrin had been paid nothing in salary for 2011.

Negrin made a wage claim with the Texas Workforce Commission which found that Negrin's claim for unpaid wages was valid. The Court finds that Negrin worked in Venezuela during 2011 repairing AOP's aircraft to prepare it for delivery to the Venezuelan Navy. The evidence shows that Negrin earned an annual salary of over $100,000, but was paid no salary for 2011.

## D. Unpaid AOP Vendors

Negrin testified that he made loans of up to $500,000 to AOP during the entire course of his employment. Negrin's proof of claim recites that his unpaid AOP loans total $133,000. When the Venezuelan Navy sent the last installment payment to BVB, there were unpaid vendors of AOP that Negrin paid. Negrin testified that he paid mechanics involved in the repairs of the aircraft, customs expenses, supervisors who inspected the aircraft; and the hotels used by the technicians who traveled from the United States to Venezuela. Negrin paid in Venezuelan currency between 500,000 and 600,000 bolivars. Negrin testified that in 2012 alone he personally paid AOP's vendors over $300,000 U.S. dollars.

The Court credits Negrin's testimony that he paid AOP's vendors in 2012 over $300,000. The Court finds that Negrin's 2012 payments to AOP vendors constitutes new value given subsequent to Negrin's receipt of AOP's transfer of funds on August 23, 2011. The Court finds that the transfer of AOP funds to Negrin on August 23, 2011 is not avoidable under 11 U.S.C. §547.

## IV. Conclusion

Based on the foregoing, the Court concludes that the Trustee failed to prove that the transfers to Ricardo Negrin on August 23, 2011 and on November 16, 2011 are avoidable preferences under 11 U.S.C. §547. The Court concludes that judgment shall be entered that the Trustee take nothing and the case is ordered closed.

Signed this _7_ day of _March_, 2014 at Houston, Texas.

KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE